**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 7** |
| | ) | |
| **CLAUDE DANIEL MAYO, SR.** | ) | **CASE NO. 10-70428** |
| **LESSIE MAE ARRINGTON MAYO** | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| **W. CLARKSON McDOW, JR.** | ) | |
| **UNITED STATES TRUSTEE** | ) | |
| **FOR REGION FOUR** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **Adversary Proceeding No. 11-07020** |
| **v.** | ) | |
| | ) | |
| **CLAUDE DANIEL MAYO, SR.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM DECISION**

This adversary proceeding filed by the United States Trustee ("the U.S. Trustee")

seeks revocation of the discharge granted by this Court on May 25, 2010 to the Defendant,

Claude Daniel Mayo, Sr., who is a co-debtor with his wife, Lessie Mae Arrington Mayo, in the

above noted bankruptcy case.  Because revocation is sought only of Mr. Mayo's discharge, any

reference to the Debtor in this Decision will refer to him only.  Any reference to the Debtors is

intended to describe the Mayos jointly.  For the reasons and upon the findings of fact set forth

below, the Court has determined that Mr. Mayo's discharge should be revoked.

FINDINGS OF FACT

The Debtors filed a joint Chapter 7 petition in this Court on February 24, 2010

with all required supporting documentation consisting of summaries, schedules, a list of

creditors, statements, disclosures, and multiple declarations under penalty of perjury attesting to

the accuracy of their filings.  This case is by no means the Debtors' first experience with this

Court as bankruptcy debtors.  Indeed, as pointed out at trial by counsel for the U.S. Trustee, the

records of this Court indicate that Debtors have filed six joint bankruptcy cases, including two

Chapter 13 cases filed in 1994 and 2007 as well as four Chapter 7 cases filed in 1989, 1997,

2001, and the instant case filed in 2010.   The Debtors' Schedule B, filed in the present case,

represented that the male Debtor[1] was a 50% stockholder in an entity labeled "Mayo Auto Sales

Inc." ("Mayo's Auto Sales")[2] and Debtors valued this asset at $100.  Debtors also listed two

vehicles as joint property:  a 1975 Chevy truck valued at $2,000 and a 2001 Infiniti scheduled as

having an "unknown" value.  On Schedule C the Debtors claimed exemptions for these assets,

exempting the total claimed value of the business, the total claimed value of the 1975 Chevy

truck, and $3,000 for the 2001 Infiniti despite the value of the vehicle being listed as "unknown."

Debtors' income as reported on Schedule I only consisted of the Debtor's wages

---

[1] Schedule B listed the 50% interest as belonging to the male Debtor, however Exhibit B which he offered into evidence at trial shows an agreement in which both Debtors share a 50% interest in Mayo's Auto Sales.  For ease of reference throughout this Decision, the exhibits offered by the U.S. Trustee at trial are identified as numbered exhibits and the exhibits offered by the Debtor are identified as lettered exhibits.

[2] The Debtors' schedules refer to "Mayo Auto Sales" while a DMV Report shows a Toyota Camry co-owned by Mr. Mayo and "Mayo's Auto Sales."  Exhibit 3.  The Virginia.gov Dealer Database also lists the name as "Mayo's Auto Sales" and the photographs of the building show "Mayo's Auto Sales."  Exhibits 6, 11 and 12.

as a crossing guard with the school system in the city of Roanoke, both of their social security

incomes, and both of their pension or retirement incomes.  In their Statement of Financial

Affairs, despite the ownership of Mayo's Auto Sales listed on Schedule B, Debtors stated that

they had not been involved with any business within the six years prior to the commencement of

the bankruptcy case.  Debtors also stated that there had been no transfers outside the ordinary

course of the business or financial affairs of the Debtors in the two years prior to the bankruptcy

case.  The Chapter 7 trustee in the Debtors' case, Mr. Charles R. Allen, Jr. ("Mr. Allen"),

conducted the creditors' meeting on March 25, 2010.  According to the testimony of Mr. Allen

as well as the transcript of that meeting, Debtor again reported that he had not sold or otherwise

disposed of any kind of property within the last two years.  [Exhibit 15 at 3-4].  Regarding

Mayo's Auto Sales in particular, Debtor stated as follows in response to Mr. Allen's and his

attorney's questions at the 341 meeting:

> Allen: The auto sales is not—is a lot?
> Mr. Mayo: Yeah, it's a lot.
> Allen: Okay.
> Mr. Mayo: Ain't done no business for years but—
> Allen: Is there anything on the lot?
> Mr. Mayo: Sorry?
> Allen: Do you own the lot? Does the corporation own the lot?
> Mr. Mayo: No, renting it.
> Allen: Alright. Is it selling cars?
> Mr. Mayo: No, my partner is. He got money. I ain't got no money. (Mrs. Mayo giggling) I kinda hope to get—
> Allen: Do you have a half interest in the car lot?
> Mrs. Mayo: Yeah. (Whisper)
> Mr. Mayo: Yes sir.
> Allen: Okay. Well, is the car lot making any money?
> Mr. Mayo: Not really, not a lot. He is. He sells them and buy one or two everyone once in a while but I don't.
> Allen: Okay. Well, do you get— How do you get a— Are the cars sold by the corporation that you have a one-half interest in?
> Mr. Mayo: Yeah.

3

Allen: Alright.

Mr. Mayo: But he buys his cars and I've bought mine and we sell them. I don't get know [sic] money out of his cars.

Allen: Okay. Why is that?

Mr. Mayo: Because I pay half expenses and he pay half.

Allen: Okay. So you're telling me there is no value in the car lot—your interest in the car lot business?

Mr. Mayo: No. No, I ain't making no money, now.

Allen: Could you sell your interest?

Mr. Mayo: Could I sell it?

Allen: Yeah.

Mr. Mayo. Yeah, I guess.

Brown: Would anybody give you any money for it? For the right to open a car lot? For the right to sell cars off of that piece of land that you don't own?

Mr. Mayo: Ah, I don't know that. I don't know whether he would sell it to somebody else or not.

Brown: Okay, okay.

Allen: Well, do you think he's interested in buying you out?

Mr. Mayo: Ah, I've never asked him.

Brown: Do you—Do you currently have any cars in your name on the lot?

Mr. Mayo: No sir. No sir.

Brown: Okay and have you in the last 18 months?

Mr. Mayo: No sir.

Allen: Alright. Are the cars titled—When the cars are on the lot, are they in the name of Mayo Auto Sales, Inc. or –?

Mr. Mayo: Yeah.

Allen: They are. Okay. So you have a half interest in any cars there, right?

Mr. Mayo: Well, not his.

Allen: Well, you own 50% of Mayo Auto Sales, right?

Mr. Mayo: Yeah.

Allen: Alright. If you own 50% of Mayo Auto Sales and there are six cars on the lot in the name of Mayo Auto Sales, you'd have—you'd own one-half of those six cars, wouldn't you?

Mr. Mayo: Yeah. If we were buying them that a way there would be.

Brown: Let me get some more information on that.

Allen: Well.

Brown: If you want to—

Mr. Mayo: See what it is—

Brown: I need— What I need—

Allen: Go ahead. Go ahead and explain it to me.

Mr. Mayo: See the only thing it is— Okay, were in car lot together. Okay. I pay half of the expenditures cause the car I'm driving, um, I got insurance on that. It's still cheaper that a way. But he buys his cars and I don't get no money out of his. Only thing he do is pay half of the rent, light bill, gas bill and stuff like that.

4

>Allen: Do you pay all the other half?
>Mr. Mayo: Yes sir.
>Allen: Okay. How much is that a month?
>Mr. Mayo: Um, 250.
>Allen: Okay. And it's a corporation, right?
>Mr. Mayo: Yeah.
>Allen: Okay. And the deal is each of you— The profit on a car is proportionate [sic].
>It depends on who bought the car originally, correct?
>Mr. Mayo: That's right.

[Exhibit 15 at 5-7]. Mr. Allen testified at the April 5th trial that, based on these responses, he

believed that Mayo's Auto Sales had no liquidation value and that Debtor himself had no

ownership interest in any vehicles owned by the business. [Trial Transcript ("Transcript") at 20].

Mr. Allen filed a Report of No Distribution on March 25, 2010, and both Debtors subsequently

received a discharge on May 25, 2010. However, on May 24, 2010, the last day an objection to

discharge could be timely filed and almost two months after the required creditors' meeting,

Debtors amended both Schedule F and the creditor matrix to add two unsecured creditors:

La'Tisha M. Smith and Susan Morgan.

The Court takes judicial notice of the schedules and docket entries in the Debtors'

prior case filed in 2007 in which on both the original and amended versions of Schedule F

Debtors listed a debt to Susan Morgan in the amount of $14,375. Specifically in the 2007

bankruptcy Ms. Morgan hired an attorney and filed an Objection to plan confirmation. She also

initiated an adversary proceeding, which resulted in the entry on December 31, 2007 of an

agreed order granting her judgment in the amount of $14,816 against both Mr. and Mrs. Mayo

and declaring the debt non-dischargeable. Yet they failed in this case to list her claim until the

date of the deadline for objections to discharge.

Christine Wagner was also notably left off of the Debtors' schedules in the

present case.  Ms. Wagner is not only a creditor of Mr. Mayo, she is also his sister-in-law.  The

Debtors did schedule Ms. Wagner in the 2007 case as a joint unsecured creditor in the amount of

$5,000 representing a loan she had made to them.  Ms. Wagner filed a proof of claim as a

secured creditor, to which the Debtors objected on the ground that the debt was unsecured.  She

hired counsel to defend her claim and on September 4, 2007, an order was entered allowing the

claim as unsecured.  The 2007 case was ultimately dismissed on December 15, 2009 for failure

to make payments under a confirmed plan.  Due to the dismissal, the Debtors were unable to

obtain a discharge and remained obligated to both Ms. Morgan, whose debt had been declared to

be  "nondischargeable," and Ms. Wagner, whose claim had been allowed on an unsecured basis.

These are all facts gleaned from a review of the docket entries and orders in the 2007 case about

which there can be no legitimate dispute.

On the basis of these facts it seems improbable that the Debtors' failure in the

present case to include Ms. Morgan and Ms. Wagner among their originally listed creditors was

inadvertent and unintentional.  It is appropriate and entirely factual to make the observation that

these creditors were ones with a demonstrated history of actively participating in the 2007 case

to protect their interests as creditors.  Furthermore, it seems highly unlikely that the Debtors

would overlook the fact that they were indebted to a near relative in the amount of $5,000.  At

the section 341 meeting on March 25, 2010 Mr. Allen asked: "Are there any changes in those

schedules of which you need to advise myself or the bankruptcy court?"  The Debtors' counsel,

Mr. Brown, responded: "We have some unsecured creditors to add.  We'll get those added."  The

Debtors then waited two months to amend Schedule F.  At the trial after being asked to review

Schedule F that the Debtors filed in the present case, the Debtor was asked, "And those are all

6

the creditors that were included in your bankruptcy.  Do you see Ms. Wagner's name?"  The

Debtor replied "No, it's a whole lot that's not on here." [Transcript at 64:6-8].  These facts are

probative of the Debtor's state of mind at the time of filing when he filed a schedule under

penalty of perjury purporting to list **all** of his creditors and relevant to his credibility as a

witness.

Although the exact legal nature of Mayo's Auto Sales and its business practices

are not entirely clear, the greater weight of the evidence appears to be, despite Mr. Mayo's

testimony at the section 341 meeting and the information set forth in the schedules to the

contrary, that the entity was not a corporation but rather a partnership with the Debtors owning a

50% ownership interest and an individual named Kenneth Linkous owning the remaining 50%

ownership interest.  [Exhibit B[3]; Transcript at 75].  Mayo's Auto Sales was an ongoing operation

with a fixed location and involving active efforts by Debtor to purchase and sell vehicles both

prior and subsequent to the filing of Debtor's bankruptcy petition. [Stipulation of Facts, ¶¶ 5, 6,

7].  Debtor valued Mayo's Auto Sales at $100 on Schedule B, but was unable to explain how he

had come up with the amount at the April 5th trial. [Transcript at 99-101].  Although Debtor

---

[3] Mayo's Auto Sales 2446 Shenandoah Ave Rke Va 24017
 To whom it may concern
 I Kenneth Linkous agree to become half owner of Mayo's Auto
 Sales, and the other half belong to Claude and Lessie Mayo.  Kenneth
 Linkous agreed to pay half of all expenses at Mayo's Auto Sales such
 as half of the rent, half of the insurance, half of the light bill, half of
 dealer licenses and salesman licences, any other expenses that occure
 [sic].  Beginning Feb-1-07, all cars that Kenneth Linkous buy, all the
 money belong to him, and all repairs on his cars is his responsiabity
 [sic], all of Claude and Lessie cars they buy belong to them, and all
 repairs are their responsiabitity [sic].

Exhibit B.

7

reported to Mr. Allen at the March 25th creditors' meeting that Mayo's Auto Sales was

incorporated and listed the business as a corporation on Schedule B, counsel for Debtor at the

April 5th trial reported that the entity is in fact a partnership and Debtor testified to this as well.

[Transcript at 149-50].  The evidence before the Court supports a finding that Mayo's Auto Sales

was a partnership, as there is no indication of corporate status on either the "Dealer Database

Search" provided by the U.S. Trustee or the dealer's license provided by Debtor.  [Exhibit 6;

Exhibit A].  Furthermore, the highly unusual business arrangements between Mr. Linkous and

the Debtors memorialized in Exhibit B are more in keeping with some sort of hybrid partnership

or joint venture agreement than a corporate entity.[4]

Debtor testified extensively regarding the business methods employed by Mayo's

Auto Sales, which can best be characterized as informal.  According to Debtor, all three partners

(both Debtors and Mr. Linkous) operated through a single bank account and purchased vehicles

under the dealer license of Mayo's Auto Sales. [Transcript at 86-87, 118-20].  All vehicles

purchased in this manner were titled in the name of Mayo's Auto Sales, and Debtor believed this

to be consistent with applicable regulations covering automobile dealers. [*Id*. at 102, 132-33].

Debtor testified that he believed that vehicles titled in the name of Mayo's Auto Sales were

owned solely by Mayo's Auto Sales, and that he did not have any ownership stake in the

---

[4] In the Debtors' 2007 case, the Debtors' initial Schedule B did not list any asset
regarding Mayo's Auto Sales.  Schedule G listed a month-to-month lease on a car lot and
Schedule J listed $500 per month rent for a car lot and $161 per month for car lot insurance.  On
Debtors' Amended Schedule B the Debtors disclosed inventory of $360 and listed it as a joint
asset.  The Debtors' original Statement of Financial Affairs ("SOFA") did not list anything
regarding Mayo's Auto Sales.  The Debtors filed an Amended SOFA which listed Mayo Auto
Sales and listed the male Debtor and Mr. Linkous as each possessing a 50% interest in a
partnership.  Schedule B was never amended to add the interest prior to dismissal.

8

vehicles themselves but only in Mayo's Auto Sales.  [*Id.* at 105].  Debtor also testified that there

was no restriction on driving the vehicles owned by Mayo's Auto Sales and that he was able to

use vehicles with dealer license tags.  [*Id.* at 144-45].  The partnership shared basic operating

costs such as utilities and the rental of a lot from which to operate the business.  [*Id.* at 104-05,

123; Exhibit 15 at 7].  The financing of vehicle purchases and the distribution of any sales

proceeds, however, were not always transacted as partnership business.  Debtor repeatedly

testified that either half of the partnership could purchase a vehicle, market and sell that vehicle,

and retain all of the profits (or presumably absorb all of the losses).  Debtor provided the

following explanation about Mayo's Auto Sale's business methods in response to the U.S.

Trustee's questions:

> Q: All right.  If Mr. Linkus [sic] bought it, how would that car then be for sale?
> What would happen if it was on the lot at Mayo's Auto Sales?
> A: What would happen to it?
> Q: Yeah.  Listed for sale.
> A: Anybody could sell it.
> Q: Okay.  If somebody sells it, who got the money from it?  If Mr. Linkus bought
> this 1998 Chrysler and it got sold, who got the money?
> A: If he bought it, he got it.
> Q: Okay.  And similarly, if you bought it, you would get the money, correct?
> A: Me and my wife, yeah, if I bought it.
> Q: Okay.  You and your wife would get the money.
> A: I can't tell you which one, who bought what.
> Q: Okay, but that's the deal.  If Mr. Linkus bought the car and put it on the lot at
> Mayo's Auto Sales, then Mr. Linkus got the money, correct?
> A: Who sold it?
> Q: Anyone sold it.  If it's sold off the lot at Mayo's Auto Sales, Mr. Linkus bought
> it, Mr. Linkus--
> A: No, if he bought it, he sold it.
> Q: And then, right, because if it was his car he would be responsible for selling it,
> correct?
> A: Yes, ma'am.
> Q: Okay, and he would get the money?
> A: Uh huh.
> Q: And the same would be true for you, correct?

A: Not necessarily, if we bought it together.

As stated by Debtor, the partnership could also purchase a vehicle together, however, and split

any profit accordingly.  [Transcript at 71, 73, 85-86, 116].  Finally, Debtor testified that he

would use part of the proceeds from the sale of vehicles to finance subsequent purchases of

vehicles.  [*Id.* at 98, 126, 141].

Following the Debtor's receipt of discharge, two creditors approached Mr. Allen

about concerns they had regarding Debtor's bankruptcy case and his ongoing business

operations.  [*Id.* at 20-22].  Both creditors also testified at the April 5th trial.  The first creditor,

Ms. Susan L. Morgan, was added to Debtor's schedules the day prior to the issuance of his

discharge.  Ms. Morgan was an acquaintance, customer, and ultimately a creditor of Debtor, and

was familiar with his business.  Although Ms. Morgan could not specify a date, she witnessed

Debtor driving a Chrysler 300C ("the 300C") with dealer tags around the time of Debtor's

bankruptcy case.  [*Id.* at 41-44].  The second creditor, Ms. Christine V. Wagner, was never

included in Debtor's schedules, although Debtor admitted that he did owe money to Ms. Wagner

as of the petition date.  [*Id.* at 62].  Ms. Wagner, provided to Mr. Allen newspaper

advertisements for the 300C from October 3, 2009 and October 23, 2009 with Debtor's phone

number listed as the contact number. [Exhibits 9, 10; Transcript at 46-48].  Ms. Wagner stated

that she witnessed Debtor operating the 300C in April and May of 2009, and that Debtor

replaced the 300C with a Cadillac Escalade ("the Escalade") which she first saw in May of 2010

and last saw in August of 2011.  [Transcript at 49-50, 56].  She recalled that neither the 300C nor

the Escalade had dealer tags on them.  [*Id.* at 58].  Also around that time, Ms. Wagner observed

Debtor driving a red Chevrolet Avalanche ("the Avalanche").  [Exhibit 13].  She was not aware

10

of when precisely Debtor sold the 300C, however, nor when Debtor actually purchased the

Escalade and the Avalanche.  She did identify two locations as lots from which Mayo's Auto

Sales ran its business operations [Exhibits 11, 12], and stated that the second location closed

only days after Debtor received his discharge. [Transcript at 49].  The sign in the photograph of

the second location displays, underneath the name "Claude," the same telephone number found

in the advertisement for the 300C [Exhibits 10, 12].  Mr. Allen testified that Debtor answered a

call placed to this telephone number. [Transcript at 22].

Mr. Allen contacted the Office of the U.S. Trustee on June 23, 2010, shortly after

learning of the concerns of Ms. Morgan and Ms. Wagner [Exhibit 2].  The U.S. Trustee

subsequently obtained records from the Virginia Department of Motor Vehicles for the following

vehicles owned by Debtor as of June 30, 2010:  a 1990 Toyota Camry ("the Camry") [Exhibit 3],

a 1995 Chevrolet pick-up truck ("the pick-up truck") [Exhibit 4], and a 2001 Infiniti ("the

Infinti") [Exhibit 5].  Counsel for the U.S. Trustee conducted a sworn interview of the Debtor, an

audio recording of which was introduced as an exhibit at trial.[5]  The purpose of this interview,

conducted in the presence of his counsel, was to investigate Debtor's assets and business in light

of Mr. Allen's information.  During one point in that interview, Debtor stated that at the time of

filing his bankruptcy petition two other vehicles were titled in the name of Mayo's Auto Sales:

the Escalade and the 300C.  [Exhibit 14, 36:31-37:00].  Debtor stated during the interview that

---

[5] The U.S. Trustee's Exhibit List indicated that the interview was conducted on
September 14, 2010, however at the trial Ms. Garber on behalf of the U.S. Trustee stated that the
interview was conducted on September 14, 2011.  [Transcript at 83].  Exhibit 14 is an audio
recording of the interview indicated to have been conducted on September 14, 2010.  This audio
recording was admitted into evidence at the trial on April 5, 2012.  There is no transcript of the
hearing but a copy of the audio recording is in the possession of the Clerk's Office.

he sold the Escalade in 2010 for $18,500. [*Id.* 38:40-39:00]. Debtor then initially recalled that he had sold the 300C in 2008 for $16,000, but after reviewing Exhibits 9 and 10, Debtor said that he was only guessing about the date of sale and would need to review his records to determine the precise date. [*Id.* 39:08-41:20].

The U.S. Trustee filed his Complaint to revoke the Debtor's discharge on May 23, 2011. In that Complaint the U.S. Trustee alleges that the Debtor obtained a discharge through fraud. The U.S. Trustee further alleges that the Debtor fraudulently failed to disclose to the chapter 7 trustee that he transferred at least three vehicles within two years of the date of filing, that "prior to the filing and during the pendency of this case . . . the [Debtor] had in his possession or control at least one additional vehicle which he did not disclose to the chapter 7 trustee[,]" and that the intentional concealment of transfers and assets constitutes fraud in fact. The Complaint further alleges that the U.S. Trustee did not learn of said fraud until June of 2010, after the discharge had been granted, that if such fraud had been known prior to the grant of the discharge, such discharge would have been denied, and that the Debtor's discharge should be revoked under 11 U.S.C. § 727(d)(1).

In the Debtor's Answer filed June 15, 2011, he denied receiving a discharge through fraud and the transfers and possession of additional vehicles that were not disclosed. He further asserted that he did not have knowledge of when the U.S. Trustee learned of the information cited in the Complaint and therefore denied that such knowledge did not exist prior to the entry of the discharge order. Finally the Debtor denied that his discharge should be revoked under §727(d)(1).

The evidence references six vehicles at issue which will be evaluated in turn: the

12

Camry, the pick-up truck, the Infiniti, the 300C, the Escalade, and the Avalanche.

Beginning with the Camry, this vehicle was not included in either Schedule B or the Statement of Financial Affairs.  Exhibit 3 indicates that Debtor did own the vehicle at one point in conjunction with Mayo's Auto Sales.  Debtor stated during the interview on September 14 that Mayo's Auto Sales sold the vehicle in the ordinary course of the dealership business and provided financing to the purchasers, but repossessed it after the engine failed and the purchasers stopped making payments.  He further said that he titled the vehicle in his own name after reacquiring it and subsequently sold it for scrap value.  At the April 5th trial, Debtor essentially repeated his earlier statements, testifying that Mayo's Auto Sales had repossessed the Camry and transferred the title to him, and that he then sold the vehicle to a junkyard.  Debtor stated that although the sale took place within two years of the bankruptcy petition, he did not list it on his bankruptcy schedules because he no longer possessed the vehicle and had spent the proceeds obtained from the sale of the vehicle.  [Transcript at 135-37].

The pick-up truck was listed in Schedule B with a value of $2,000, although Debtor erroneously labeled it as a "1975 Chevy Truck" instead of a 1995 truck.  Debtor testified to this error both during the September 14 interview and at trial, stating that he had never owned a 1975 Chevrolet truck and that the reference to such a vehicle was a typographical error. [Transcript at 135].  According to state records, Debtor owned this vehicle in his own name. [Exhibit 4].  Debtor initially purchased the vehicle in 1995, and stated during the interview that he had re-titled the vehicle from Mayo's Auto Sales into his name multiple times in order to secure loans.  [Exhibit 14, 28:00-33:08].  Debtor also listed the pick-up truck as exempt in Schedule C for the full listed value of $2,000, though it was again listed as a "1975 Chevy

13

truck."

Debtor also listed the Infiniti in Schedule B but with an unknown value.  On

Schedule C, Debtor again listed the value as unknown but claimed an exemption of $3,000.

State records again show that Debtor did own this vehicle as of June 30, 2010 [Exhibit 5], and

Debtor testified during the interview that the vehicle had never been sold though it has since

been re-titled in the name of Mayo's Auto Sales.  [Exhibit 14, 34:54-36:24].  At the April 5th

trial, Debtor testified that the Infiniti was titled in his name at the time he filed his petition and

that he properly disclosed his ownership interest.  [Transcript at 82, 110, 134].

The 300C was not listed in Debtor's schedules, and was first referenced in the

evidence in the e-mail message sent by Mr. Allen to the U.S. Trustee.  [Exhibit 2].  The evidence

contains no official records indicating that Debtor ever directly owned the 300C, and Debtor

testified repeatedly that, pursuant to his understanding of the titling requirements for car dealers,

the 300C was titled in the name of Mayo's Auto Sales. [Transcript at 71, 102, 132-33, 137, 141,

145].  Debtor testified at trial that he did not list the 300C in his schedules because "we thought

Mayo Auto Sales was different from being in my name, Claude Mayo.  That's the way I always

operated."  [*Id*. at 138].

Debtor testified during the interview that he possessed the 300C at the time he

filed his petition in February of 2010, but then stated that he sold the 300C in 2008.  [Exhibit 14,

36:32-37:00].  Although Debtor testified at length at the April 5th trial regarding the 300C, his

testimony also does not clearly indicate when he sold the vehicle, although he did state that it

was a vehicle owned and sold by Mayo's Auto Sales.  [*Id*. at 102].  The vehicle was acquired by

Mayo's Auto Sales at an automobile auction in Greensboro, North Carolina for approximately

14

$15,000, and Debtor agreed he did not buy the 300C together with anyone else, that he was responsible for the sale of the 300C, and that he received the proceeds from the sale of the 300C. [*Id.* at 69, 71, 72, 117-18]. Debtor did state at one point that the 300C was a joint purchase with Mr. Linkous [*Id.* at 116], but then subsequently said that Mr. Linkous was not present at the Greensboro auction. [*Id.* at 117-18]. Ms. Morgan testified that she saw Debtor with the 300C around the time of Debtor's bankruptcy case but admitted she did not know in whose name the vehicle was titled. [*Id.* at 41-44]. Ms. Wagner, on the other hand, testified that she saw Debtor driving the 300C in April and May of 2009 as well as newspaper advertisements for the vehicle in October of 2009. She believed that the 300C was replaced by an Escalade she last saw in August of 2011, indicating to her that the 300C was sold in between that date and the time of the newspaper advertisements. She also admitted, however, that she did not know the exact date of sale or in whose name the 300C was titled. [*Id.* at 49-50, 52-54, 58-59].

Debtor's testimony at the trial about the sale of the vehicle was equally inconclusive, as Debtor stated multiple times that he was not completely sure whether he sold the vehicle before or after filing his bankruptcy petition. [Transcript at 66, 68, 106, 109, 124, 137]. The newspaper advertisements at Exhibits 9 and 10 indicate, however, that the 300C was for sale at least from October 3 to October 23, 2009, and Debtor agreed that the advertisements were placed by Mayo's Auto Sales and that the phone number provided in the advertisements was his phone number at that time. [Transcript at 69-70, 102, 114-15]. Mr. Allen and Ms. Wagner also corroborated the fact that the phone number belonged to Mr. Mayo. [*Id.* at 21-22, 48]. Debtor testified that the proceeds from the sale of the 300C were used for various purposes, including personal and partnership expenses, but that part went to the purchase of the Escalade. [*Id.* at 98,

15

126-28, 141].

According to the Debtor's account given during the September 14 interview, Mayo's Auto Sales owned the Escalade at the time Debtor filed his bankruptcy petition and sold it in 2010 for $18,500. [Exhibit 14, 36:32-36:46, 38:40-39:00; Transcript at 65, 66], though he testified on April 5th that it sold for only $12,000 or $13,000. [*Id.* at 82]. Ms. Wagner testified that the Escalade replaced the 300C, and she first starting seeing the Escalade in May of 2010 and last saw it in August of 2011. [*Id.* at 50, 56]. The vehicle was again titled in the name of Mayo's Auto Sales according to Debtor. [*Id.* at 66, 141, 145]. He received all the proceeds from the sale of the Escalade, as Mr. Linkous had no interest in the vehicle per the operating procedures of the partnership. [*Id.* at 79-80]. Debtor used those funds to pay personal bills and the ongoing costs of Mayo's Auto Sales. [*Id.* at 98-99, 105].

Finally, the evidence regarding the Avalanche at Exhibit 13 indicates that Debtor purchased it in the winter of 2011. [*Id.* at 126]. It is not clear if this vehicle is titled in the name of Mayo's Auto Sales or the Debtor. Ms. Wagner stated, however, that the Avalanche was being used by Debtor during the same time he had the Escalade in 2010. [*Id.* at 52, 55, 57]. The vehicle is not referenced in the schedules, and the only evidence regarding the Avalanche is an undated photograph at Exhibit 13 with a license plate that reads "CD-MAYO".

While, unfortunately, the evidence does not pin down precisely when the Chrysler 300C was sold or even whether that event was prior to or after the filing of the Debtors' bankruptcy petition, or similarly whether the Cadillac Escalade was acquired before or after the filing of such petition, it does seem reasonably clear that such events did occur within a period of a few months around the time of the filing date. The greater weight of the evidence is that one or

16

the other of these vehicles was owned on the filing date and that such ownership was not

disclosed either in the bankruptcy filings or in the Debtor's testimony at the section 341 meeting

of creditors.  The Court recognizes an alternate possibility that the 300C may have been sold

before bankruptcy and the Escalade not acquired until after the filing date, but even if that

possibility cannot be ruled out with complete confidence, it is evident that the Debtors failed to

disclose the ownership of either vehicle or of the sale proceeds of the 300C.  The Court further

finds that the Debtor was fully aware that the actual business arrangements between the Mayos

and Mr. Linkous were not consistent with Mayo's Auto Sales being a separate economic entity

as a corporation or partnership.  It is quite clear that Mr. Mayo titled vehicles either in his name

or jointly with Mrs. Mayo or under the business name of Mayo's Auto Sales as it suited his

purposes from time to time and did not in practice treat that business as something separate from

his or their own property.  For example, the evidence discloses from the Debtor's own

admissions that he followed a practice of moving vehicle titles back and forth from personal

name or names to the business name as seemed advantageous at the time, such as for the purpose

of borrowing money upon the security of a lien on a vehicle title.

   The Court further finds by a preponderance of the evidence that the United States

Trustee was not aware of the information upon which this adversary proceeding was filed until

being made aware of it by the Chapter 7 Trustee, an event which occurred after the Court had

awarded a discharge to the Debtors.  This finding is supported by both the reasonable inferences

from the testimony of Mr. Allen at the April 5[6] trial[6] and the direct testimony to such effect by

---

[6] The Court has struggled with this initial portion of such finding because at trial no
testimony was offered by any employee of the United States Trustee to the effect that such office
had no knowledge of the information provided by Ms. Morgan and Ms. Wagner prior to receipt

John Byrnes, the Assistant United States Trustee for the Western District of Virginia, at a post-trial evidentiary hearing held on November 5, 2012 pursuant to the Court's granting of the U. S. Trustee's motion to re-open the evidence for that specific purpose.  Certainly no evidence of any kind to the contrary has been offered either at trial or afterwards.

This Decision has been greatly delayed beyond the time ordinarily taken by the Court to decide matters of this kind and it therefore wishes to explain why that has been the case. First, time was necessary for the preparation of the transcript of the trial and then counsel were provided an opportunity according to the briefing schedule they requested to submit their written arguments.  In his arguments on behalf of the Debtor, his counsel noted that no direct testimony had been offered to establish that the U. S. Trustee did not have any knowledge of the information upon which his Complaint was based prior to the award of the discharge.  The Court requested that opposing counsel respond to that contention.  Ultimately the U. S. Trustee filed a motion requesting the Court to re-open the evidence so that this asserted deficiency in the evidence could be addressed by testimony from Mr. Byrnes.  Although, unfortunately, the

---

of Mr. Allen's communication on that point.  Because the testimony of one of his assistants was obviously readily available to the plaintiff at trial but was not offered at that time, the Court was concerned with an adverse evidentiary implication arising due to the failure to offer such evidence.  After considerable thought on this point, however, the Court has concluded that the finding is nevertheless a reasonable inference from the evidence offered at trial because Mr. Allen testified that his knowledge gained from Ms. Morgan and Ms. Wagner was his first awareness of that information, that he did not learn of it until after the issuance of the discharge, and that he promptly advised the U. S. Trustee with respect to that information.  The Court believes and therefore finds that it would be highly unlikely that the U. S. Trustee would have obtained such information previously and not communicated it to the Chapter 7 trustee assigned to the case and therefore finds that the greater weight of the evidence supports that finding even without the later confirming testimony from the Assistant United States Trustee.

Debtor became gravely ill and ultimately died[7] before that motion could be heard, it was heard

on October 11, 2012 and granted.  The post-trial evidentiary hearing held pursuant to the grant of

that motion took place on November 5, 2012, after which this adversary proceeding was finally

ready to be decided.

CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C.

§§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on

July 24, 1984 and Rule 3 of the Local Rules of the United States District Court for the Western

District of Virginia.  An adversary proceeding to revoke a discharge granted by the Court is a

"core" bankruptcy proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  The Court further concludes

that it has constitutional as well as statutory authority to decide this proceeding.

The statutory authority for the revocation of a bankruptcy discharge previously

granted is found in § 727(d), which sets forth in relevant part as follows:

> On the request of the trustee, a creditor, or the United States trustee,
> and after notice and a hearing, the court shall revoke a discharge
> granted under subsection (a) of this section if–
>> (1) such discharge was obtained through the fraud of the
>> debtor, and the requesting party did not know of such fraud
>> until after the granting of such discharge;
>> (2) the debtor acquired property that is property of the estate,
>> or became entitled to acquire property that would be property
>> of the estate, and knowingly and fraudulently failed to report
>> the acquisition of or entitlement to such property, or to
>> deliver or surrender such property to the trustee.

The District Court for the Eastern District of Virginia addressed a debtor's appeal

of a Bankruptcy Court decision that revoked her discharge in the case of *Dean v. McDow*, 299

---

[7] See docket entry # 55.

19

B.R. 133 (E.D. Va. 2003).  The District Court affirmed the Bankruptcy Court's revocation and

held that there was no error in the determination that the debtor knowingly and fraudulently

made false oaths.  *Id.* at 139-140.  *Dean* came about in much the same circumstances as the case

presently before this Court.  In both cases the Debtors were granted discharges, the U.S. Trustee

filed motions to reopen the cases, and then the U.S. Trustee filed complaints to revoke the

discharges.  In addition, both cases involve the transfer of assets prior to filing and the fraudulent

concealment of those transfers.  *Id.* at 136.  In *Dean* the debtor failed to disclose her ownership

and operation of a thrift store, failed to disclose the sale of jewelry and antiques within one year

prior to filing, and failed to disclose losses due to theft.  The debtor argued that she lacked the

necessary fraudulent intent.  The District Court reviewed the requirements of § 727(d)(1) as they

interrelate with § 727(a)(4).  § 727(a)(4) sets out, "the debtor knowingly and fraudulently, in or

in connection with the case - - (A) made a false oath or account."  After a thorough analysis of

precedent, the Court determined that the Bankruptcy Court was correct in revoking her

discharge.  In determining whether the qualifiers "knowingly" and "fraudulently" were satisfied,

the Court cited an earlier Eastern District Court decision, *Hatton v. Spencer*, 204 B.R. 477 (E.D.

Va. 1997).

       The District Court in *Hatton* affirmed the Bankruptcy Court's denial of discharge

on the basis that the debtors made false oaths knowingly and fraudulently.  *Id.* at 484.  "As the

finder of fact, the bankruptcy court had the opportunity to judge the credibility of the Hattons'

protestations of innocent naivete, and it clearly rejected them in favor of a darker story of fraud

and willful misconduct."  *Id.* at 483.  The decision goes on to state that fraudulent intent can be

determined either by circumstantial evidence or drawn by inference from a course of conduct.

20

"Thus, a 'pattern of concealment and nondisclosure' would permit an inference of the requisite intent."  *Id*. at 484 (quoting *In re Ingle*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)).  In the present case, a "pattern of concealment and nondisclosure" has been thoroughly established throughout the record as set forth above.

In a similar case, the District Court for the Eastern District of Virginia affirmed the denial of a debtor's discharge in a 2011 decision.  *Jalaljel v. Pugsley*, 2011 U.S. Dist. LEXIS 38537 (E.D. Va. Apr. 8, 2011).  The Court held that the debtor "forfeited his right to a discharge"[8] by knowingly and fraudulently omitting and undervaluing assets, or at the very least, by recklessly disregarding the truth.  In the same year the Bankruptcy Court for the Western District of Virginia examined revocation of a discharge in the Chapter 13 context in the case of *Beskin v. Knupp*, 461 B.R. 351 (Bankr. W.D. Va. 2011).  The applicable provision § 1328(e) requires establishing the same elements, "knowingly" and "fraudulently."  In that case the debtor received an inheritance and did not report it.  The Court determined, based on her attorney's testimony, that she knew of her duty to report the inheritance.  Instead, however, she then used the funds she inherited to pay off the balance of payments due under her confirmed Chapter 13 case.  *Id.* at 357.  The Court found that these actions were undertaken knowingly and fraudulently and revoked the debtor's discharge.

## DECISION

The result of this adversary proceeding turns on whether the Court accepts the Debtor's explanation offered at trial for his failure to disclose the Chrysler 300C, or possibly its proceeds, namely, because "we thought Mayo Auto Sales was different from being in my name,

---

[8] *Id.* at *9.

21

Claude Mayo. That's the way I always operated." [*Id.* at 138]. Under the facts and

circumstances proved here, the Court concludes that such explanation is neither credible nor

offered in good faith. Under other facts such an explanation could be both legitimate and well

founded. That is not the case here, however, because the lengthy excerpt cited earlier in this

opinion from the testimony of the Debtor at the section 341 meeting in response to Mr. Allen's

questions about Mayo's Auto Sales demonstrated a willful attempt on the former's part to

conceal his active and recent involvement in the business of buying and selling cars under that

business name. Particularly persuasive to the Court in reaching its assessment of the Debtor's

credibility is the following passage from that testimony:

> Allen: The auto sales is not—is a lot?
> Mr. Mayo: Yeah, it's a lot.
> Allen: Okay.
> Mr. Mayo: Ain't done no business for years but—
> Allen: Is there anything on the lot?
> Mr. Mayo: Sorry?
> Allen: Do you own the lot? Does the corporation own the lot?
> Mr. Mayo: No, renting it.
> Allen: Alright. Is it selling cars?
> Mr. Mayo: No, my partner is. He got money. I ain't got no money.
> (Mrs. Mayo giggling) I kinda hope to get -

This testimony was simply not truthful and the Court is quite satisfied that Mr. Mayo knew it

was not truthful when he offered it. That account did accomplish its apparent intended purpose

of dissuading the bankruptcy trustee from making a further inquiry into the business status and

assets of the dealership. The Court has also taken into account the Debtor's demeanor at trial,

particularly his vague and evasive responses to the pointed questions put to him, and has reached

the conclusion that Mr. Mayo was simply not a credible witness.

> The Court further finds probative the false representation that Mayo's Auto Sales

22

was a corporation when the Debtor was in possession of information from which he surely knew

that such business was not incorporated, or in the unlikely event that he had somehow reached an

incorrect understanding, that he made such representation with a reckless disregard of his duty to

disclose accurate asset and business information to this creditors and this Court.  Also telling on

this point is the fact that in their 2007 bankruptcy, the Debtors listed dealership assets under the

category of "inventory" on their Amended Schedule B filed June 13, 2007.  This inventory was

listed as a joint asset valued at $360 and consisted of a desk, chair, filing cabinet, refrigerator,

love seat, three folding chairs, and a 1991 Cadillac.  The Debtors' Amended Schedule B in the

2007 case was filed after the indicated date of the partnership agreement with Mr. Linkous.

Therefore, the Debtors listed inventory of Mayo's Auto Sales as an asset in their bankruptcy

schedules on June 13, 2007.  This further erodes the credibility of Mr. Mayo's assertion that he

had always regarded Mayo's Auto Sales as a separate entity.

Additionally, the cavalier failure to disclose all of the Debtors' creditors

evidences a clear disregard of the seriousness of providing correct and complete information in

one's bankruptcy schedules and other statements accompanying the bankruptcy petition as well

as testimony given in response to questions from the case trustee and other parties in interest.

Finally, the nature of the agreement between the Debtors and Mr. Linkous demonstrates that the

parties were acting for their own accounts in buying and selling vehicles under that dealership

name.  Although the wording of that agreement (Exhibit B) was not drafted by someone having

any apparent legal training, it is nevertheless clear and perhaps more revealing than more

sophisticated language might be: "all cars that Kenneth Linkous buy, all the money belong to

him, and all repairs on his cars is his responsiabity [sic], all of Claude and Lessie cars they buy

belong to them, and all repairs are their responsiabitity [sic]."  This manner of conducting the

dealership business which the Debtors agreed to with Mr. Linkous establishes that either Mr.

Mayo individually, or the Debtors jointly, at the time they filed their 2010 bankruptcy case either

beneficially owned the 300C or the proceeds derived from its sale, and that the Debtor

knowingly failed to disclose such facts either in the filed documents or in the testimony given at

the section 341 meeting.

The Court further concludes that, under the facts and circumstances of this case,

the failure to disclose the relevant information about the ownership of the Chrysler 300C was a

material omission which resulted in Mr. Allen filing a "no asset" report and deprived the

Debtors' creditors of receiving any distribution upon their claims, that such failure constituted

fraud in fact on the Debtor's part, and that if such fact had been known by Mr. Allen or the U. S.

Trustee before the discharge was granted, which was not the case, it would have resulted, if

properly pursued, in the denial of a discharge to the Debtor in the first instance pursuant to §

727(a)(4)(A).  The parties have conceded that, under the authority of decisions such as *Levy v.*

*Lexington County, S.C.*, 589  F.3d 708, 714 (4th Cir. 2009), this Court had the discretion to re-

open the evidence to permit Mr. Byrnes to testify.  The Court believes that its decision to

exercise its discretion for that purpose is justified because (i) it permitted the supplementation of

the evidence as to an important question, specifically, the lack of pre-discharge knowledge on

the part of the U. S. Trustee, which was not the subject of real factual dispute, (ii) the timing of

the reception of such evidence following trial was not prejudicial to the Debtor in the legal sense

of that term as his counsel was provided full opportunity to cross-examine such witness, and (iii)

the denial of such motion could have resulted in the Debtor's escape from the consequences of

his wrongful and fraudulent conduct in this case, which in the Court's view would qualify as an injustice under the circumstances here present.  Therefore, finally, the Court concludes that the Debtor's discharge ought to be revoked pursuant to the authority contained in § 727(d)(1).  An order to that effect will be entered contemporaneously herewith.

DECIDED this 28th day of December, 2012.

_William F. Stone, Jr._
UNITED STATES BANKRUPTCY JUDGE